*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



## MEMORANDUM OPINION

No. 04-10-00018-CR

Samantha Lace **CARR**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 79th Judicial District Court, Jim Wells County, Texas
Trial Court No. 09-04-12604-CR
Honorable Richard C. Terrell, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Karen Angelini, Justice
Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice

Delivered and Filed:  November 10, 2010

AFFIRMED

Appellant, Samantha Lace Carr, a single mother of two children, was indicted for the offense of injury to a child.  A jury found her guilty and the trial court assessed punishment at fifteen years' confinement.  In two issues, appellant challenges the legal and factual sufficiency of the evidence.  We affirm.

**DISCUSSION**

Appellant asserts the evidence is insufficient for several reasons. First, appellant contends the testimony of an accomplice, Luis Javier Contreras, was the only evidence submitted on the issue of whether she had injured her three-year-old daughter, M.M. Appellant argues that because Contreras's testimony was not corroborated, the evidence is legally insufficient. Appellant also contends the evidence was not sufficient to find her guilty under the law of parties because there is no evidence she solicited, encouraged, directed, aided, or attempted to aid Contreras or any other person in striking M.M. Finally, appellant asserts there is no credible factual evidence that she intentionally or knowingly struck her daughter and the evidence overwhelmingly supports a conclusion that Contreras solely caused M.M.'s injuries.

The Court of Criminal Appeals recently held there is "no meaningful distinction between the *Jackson v. Virginia* legal-sufficiency standard and the *Clewis* factual-sufficiency standard" and "the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *See Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *8, 14 (Tex. Crim. App. Oct. 6, 2010) (overruling *Clewis*). Accordingly, we will apply the same standard of review to all of appellant's sufficiency complaints. That standard requires us to determine whether, after considering all the evidence in the light most favorable to the verdict, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Id.* at *8. The trier of fact may draw reasonable inferences and is the exclusive judge of the witnesses' credibility and the weight to give their testimony. *Jones v. State*, 944 S.W.2d 642, 647–49 (Tex. Crim. App. 1996). The standard of review is the same in both direct and circumstantial evidence cases. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

## BACKGROUND

Appellant, her five-year-old son, her daughter M.M., and Contreras all lived together in the same apartment. Appellant testified that on March 8, 2009, she arrived home to find M.M. on Contreras's lap, and when he asked the child to tell appellant what happened, M.M. responded that she fell on her toy castle. M.M. had bruises on the side of her face. Four days later, appellant awoke to find M.M. sitting at a table with her hands on her head. Appellant asked Contreras how long M.M. had been sitting at the table, and Contreras responded, "Oh, we're working on an hour, hour-and-a-half." When appellant called M.M. from the table, Contreras walked over, picked up the child, and took her to her bedroom. Appellant said she heard her daughter say "don't hurt me," and when appellant walked into M.M.'s room, M.M. was face down on the bed and Contreras held a belt in his hand. According to appellant, Contreras told M.M. to "go ahead, cry to your mom. I didn't do anything to you." Contreras left the room, and when appellant held M.M., M.M. said her back hurt. Appellant said M.M. had two long bruises on her lower back. When appellant confronted Contreras, he said M.M. had fallen on her bed rail. A few days later, on either March 14 or 15, appellant discovered two bite marks on M.M.'s buttocks. Contreras told appellant that her son had bitten M.M. Later, when M.M. told her mother that Contreras had bitten her, Contreras grabbed M.M.'s face and asked why she was lying. Appellant argued with Contreras and then took her two children to a back bedroom.

On the morning of March 16, appellant left her house with her son for a doctor's appointment; she said M.M. and Contreras were both asleep in appellant's bedroom. As they were leaving the doctor's office, appellant told the doctor she thought M.M. had been "beaten

up." When she arrived back at her apartment, Contreras told her M.M. had fallen, again. Appellant found M.M. sitting up in the middle of her bed, propped up against the wall. M.M. pointed to one leg and said, "This one's broken." She pointed to her other leg and said, "This one works." Appellant, both of her children, and Contreras all drove to the hospital. At the hospital, appellant saw fresh injuries to M.M. Appellant told Contreras he needed to talk to the hospital staff, but he refused and asked her for the truck keys. Appellant gave him the keys, and he left with her son.

Appellant gave a statement to the police that same day. In her written statement, appellant stated some of M.M.'s bruises were caused by falls or "her running into things," but she also stated as follows:

> I know I have spanked my daughter [M.M.] but have never left bruises on her body. The belt marks and bite marks on her were not physically done by me. [Contreras] was the only other one (adult) in the household that could have done these bruises. . . . Other then [sic] the kids telling me what he did and what I know I didn't do Every bruise that [M.M.] has bite marks, belt marks, black eyes, swollen forehead, I know he did it. . . . .

Once back at her apartment, and with her son returned home, appellant waited for Contreras to return, which he did that evening. Investigators arrived at appellant's apartment the next day. When one of the investigators asked appellant if Contreras had hurt M.M., she nodded "yes" because she did not want Contreras to hear her.

Appellant admitted she would spank her children, but after a 2008 parenting class, she stopped hitting them and only gave them "time outs." She claimed she did not cause any of the injuries to M.M., and although she saw Contreras spank M.M. only once, she believed he was the person who caused some of M.M.'s injuries. As to other injuries, appellant believed they were caused by M.M. falling down. Appellant said she saw M.M.'s injuries, but Contreras would not

allow her to take the child to a doctor. She also said she did not call the police because she was afraid of Contreras.

Monica Chapa was a charge nurse at Christus Spohn Alice hospital when M.M. was first admitted to the emergency room on March 16, 2009. She said when she walked into the triage room, she saw a little girl with two black eyes, bruising on her face, and a cut on her lip. When Chapa asked appellant what happened to the child, appellant responded that M.M. had "fallen multiple times and hit her head on a coffee table." Chapa described appellant as being "very defensive, her voice was kind of cracking, shaky." Chapa then took appellant and M.M. into another room where she undressed M.M. At this time, Chapa saw multiple bruises of different shapes and in different stages of bruising all over M.M.'s arms, legs, back, and pubic area. She also saw a belt mark and two big bumps on the back of M.M.'s head. While in the room, appellant was on her cell phone speaking with her step-father. Chapa overheard her say, "they're asking me all sorts of questions, they want to know what happened, I don't know what to do." When Chapa asked appellant if anyone had ever hit or abused M.M., appellant said "maybe her brother could have hit or hurt her."

Laura Gallardo, a Child Protective Services investigator, was called to the hospital on March 16, 2009. At that time, appellant told her M.M. had fallen and she did not know where the bite marks came from. Gallardo said appellant neither admitted nor denied causing any of the injuries. Detective Michael Jaramillo testified he also was called to the hospital on March 16. Appellant told him M.M. fell down "a lot." Jaramillo described appellant's demeanor as "upset that he was there" and "mad." Jaramillo later took appellant's written statement at the police station. The next day, Jaramillo also took Contreras's video-recorded statement at the police station. In this statement, Contreras said appellant's son bit M.M. on the buttocks; he

admitted to spanking M.M. two or three times, always in appellant's presence; and he said appellant only spanked her children on their buttocks. A few hours later, Contreras was arrested. About a week later, while in custody, Contreras gave a written statement in which he admitted he spanked M.M., once accidently hitting her in the genital area, and he admitted to accidently biting her while they were playing. He stated he saw appellant "beat her kids daily" and "with [his] belt severly [sic]." He also stated he told appellant to take M.M. to the hospital, but she refused.

After about two hours at Christus Spohn Alice, M.M. was transferred to Driscoll Hospital. Dr. Nancy Harper, medical director for the child abuse program at Driscoll Hospital, testified she saw M.M. after M.M. had been admitted to the hospital. At this time, M.M. had been in the hospital for about nine days, her injuries were healing, and her leg was broken. When Dr. Harper examined M.M., she had hard bumps from swelling in the back of her head. She still had "impressive bruising" on her face and around her eyes, fading bruises on her back and buttocks, small scars on her stomach, and some injuries in her genital area. Dr. Harper explained to the jury that some of the C-shaped marks on M.M.'s body were similar to adult-size bite marks. As to other bruises, Dr. Harper stated that although she did not know what instrument, tool, or weapon caused the injuries, the bruises were not consistent with accidental injuries. Dr. Harper testified that some of the bruising to M.M.'s head was caused by her hair being forcibly torn out. Dr. Harper opined that permanent injury or mortality could result from M.M.'s injuries. According to Dr. Harper, not all of M.M.'s injuries were new; some were older injuries.

## SUFFICIENCY OF THE EVIDENCE

Appellant first argues the evidence is insufficient to support her conviction because Contreras's statement was not corroborated. Appellant relies on Texas Code of Criminal Procedure article 38.14, which provides that a "conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). According to appellant, Contreras was an accomplice, but no evidence was adduced to corroborate his statement that she beat her children. However, Contreras did not testify at trial, and only in-court accomplice testimony is subject to the article 38.14 requirement of corroboration. *Bingham v. State*, 913 S.W.2d 208, 210–11 (Tex. Crim. App. 1995) (op. on reh'g) (holding that out-of-court statements do not fall under the definition of "testimony"). Therefore, the State was not required to offer evidence corroborating Contreras's out-of-court statement.[1]

Appellant next asserts the evidence is insufficient because a close reading of her written statement to the police shows the State attempted to "splice" the end of one sentence to the beginning of another sentence to form a single incriminating sentence. The statement about which appellant complains reads as follows: "Other then [sic] the kids telling me what he did and what I know I didn't *do Every* bruise that [M.M.] has bite marks, belt marks, black eyes, swollen forehead, I know he did it." (Emphasis added.) There is no period at the end of the word "do" and the word "every" begins with a capital E. Appellant asserts the State's position is that the sentence should read "I know I didn't do Every bruise that [M.M.] has . . . ." However, appellant

---

[1] Because we conclude the evidence is sufficient based upon Contreras's statement, we do not address whether the evidence is sufficient to support a conviction under a law of parties theory.

argues these are two separate sentences in which she explains what she knows of the injuries, denies responsibility, and shares her belief that Contreras is responsible for M.M.'s injuries.

Appellant also contends the evidence is insufficient because Contreras's written statement to the police is not factually credible because, for example, he admitted he was responsible for spanking M.M.'s genitals and biting her; in his video-taped statement he did not say appellant "beat" her children, but instead said she only spanked them on the buttocks; and each time appellant noticed bruising or a mark on M.M., Contreras was the only adult present.

The jury was entitled to its own interpretation of appellant's written statement and the jury was the exclusive judge of the witnesses' credibility and the weight to give their testimony. In addition to Contreras's video-taped and written statements, the jury heard evidence about the extent of M.M.'s injuries, that her injuries were not typical childhood injuries, and that some of her injuries were not new. The jury also was free to draw its own inferences from appellant's refusal to take M.M. to a doctor despite the number of injuries and her suspicion that Contreras was harming the child. After considering all the evidence in the light most favorable to the verdict, we conclude a jury was rationally justified in finding guilt beyond a reasonable doubt.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice

Do not publish